RICHARD L. McLEOD ET AL., APPELLEES, V. H. R. CRAWFORD
ET AL., APPELLANTS.
126 N. W. 2d 663

Filed March 6, 1964. No. 35515.

Miles N. Lee, C. L. Robinson, and Ray L. Svehla, for appellants.

Robert L. Jeffrey and Richard L. Goos, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, SPENCER, BOSLAUGH, and BROWER, JJ., and LYNCH, District Judge.

WHITE, C. J.

This is an action for breach of contract growing out of three territorial agreements in the State of Nebraska between the plaintiffs, McLeods, and the defendants, Crawfords, as to the use of the "Dairy Queen" soft ice cream trademark and the soft ice cream machine used in connection therewith, being described herein as Patent No. 2080971. The questions presented in this case arise out of the defendants' claim that the territorial contracts entered into were illegal, being a "patent misuse" because they were agreements against public policy in extending the patent monopoly beyond the expiration date of the patent. These contracts gave the use of the Nebraska trademark "Dairy Queen" and the use of the machine to the defendants. The defendants agreed to operate "Dairy Queen" stores and to make payments to the plaintiffs according to the number of gallons of soft ice cream mix used and sold in the "Dairy Queen" stores. The amounts actually used were stipulated and agreed to so no question arises in this respect. The district court rejected the defense of illegality, held the contracts enforceable to the extent of the actual use by the defendants of the trademark and the machines in the territories contracted for, and entered judgment for the plaintiffs in the sum of $18,357.30, interest, and costs. Defendants' counterclaim for payments that had been made on the contracts was also dismissed. The defendants appeal.

The material facts as to the issues presented are not essentially in dispute. On June 24, 1950, June 4, 1951, and March 3, 1953, the parties executed agreements covering the respective territories of Harlan and Hamilton, Saline, and York Counties. From these almost identical contracts, we extract the pertinent recitals and

provisions with respect to the issues presented. They are:

1. The plaintiffs have purchased from McCulloughs Dairy Queen of Geneseo, Illinois, the right to use the registered Nebraska trademark "Dairy Queen" and the right to use the freezing and dispensing machine connected therewith, being Patent No. 2080971. The right to the use of the machine was acquired by McCulloughs Dairy Queen from the patent owner, Ar-Tik Systems, Inc., Miami, Florida.

2. For the right to use the trade name "Dairy Queen" and the dispensing machines, the defendants agree to pay a cash sum (about which there is no controversy), and "the sum of sixteen (16¢) cents a gallon on each and every gallon of mix used, or sold within said territory, *hereinafter*." (Emphasis supplied.) The second and third contracts for Saline and York Counties provided for 26¢ and 23¢ per gallon of mix, respectively.

3. The defendants, Crawfords, agree to keep records of the amount of mix used, and the Crawfords have the right to subcontract their rights, which they did, with the consent of the plaintiffs, McLeods.

4. The defendants, Crawfords, agree not to sell any other frozen or semifrozen dairy product, nor to use any other type of dispensing machine without obtaining the consent of the McLeods.

5. The Crawfords agree to maintain standards as to quality of mix, dress, and uniform by the "Dairy Queen" store operators, and agree as to when the first store will be in operation and when the first freezer will be purchased.

6. On failure to make the required payments for mix used, plaintiffs may terminate the contract on 30 days' notice.

7. The plaintiffs, McLeods, agree to pay the patent owner, Ar-Tik Systems, Inc., 4¢ per gallon of mix used. The defendants assume no obligation in this respect.

The record reveals the following facts as to the contracts and their performance:

1. Patent No. 2080971 (the dispensing machine), in full force and effect at the time of the execution of the contracts, expired May 18, 1954.

2. The defendants, Crawfords, opened "Dairy Queen" stores, bought and used the dispensing machines, and operated "Dairy Queen" stores in the territories contracted for through the year 1961. The petition in this case was filed January 2, 1959.

3. Crawfords paid the mix "royalty" or gallonage fee until about November 1957, and have not paid since, although operating "Dairy Queen" stores using the trademark and the dispensing machine in connection therewith through the year 1961.

4. No fixed time is specified in the contracts. The obligation of the Crawfords is measured by how long and how much of the mix is used and sold "hereinafter." There is no obligation to use in point of time or amount, only to pay on the contingency of voluntary use of the trademark and machine.

5. The plaintiffs, McLeods, neither guarantee the validity of the patent, nor do they have a right to terminate the contract at any time, except for nonpayment of the mix fee on mix actually used.

6. No dispute exists as to how long the stores were operated, the use of the trademark "Dairy Queen," the use of the machine, or the amount of mix used. The amounts were stipulated to, showing amounts used under the terms of the contract including and through the year 1961.

As mentioned before, the court found the contracts enforceable, and entered judgment for the mix fee due under their terms in the sum of $18,357.30.

The defendants cite numerous propositions of law and list many assignments of error. They all flow from, or boil down to, one fundamental contention that the contracts were illegal and unenforceable because they

licensed or contracted for the use of Patent No. 2080971 beyond the 17-year period of the patent monopoly granted by the United States. The patent expired May 18, 1954, several years after the first contract was executed and a little over a year after the last one of March 3, 1953. They argue that the contracts required payments beyond the patent expiration date and were therefore illegal and against public policy; and then they proceed to consecutively argue failure of substantial performance, their innocence as to the claimed illegality, their right to use the trademark and machines free of the mix charge, and their affirmative right to recover all back payments made under the contract. This contention is based primarily on the doctrine of patent misuse and illegality set out in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., 302 F. 2d 496, and the cases cited therein supporting it. Scott Paper Co. v. Marcalus Mfg. Co., Inc., 326 U. S. 249, 66 S. Ct. 101, 90 L. Ed. 47; American Securit Co. v. Shatterproof Glass Corp., 268 F. 2d 769; and on the effect of illegality, United States Gypsum Co. v. National Gypsum Co., 352 U. S. 457, 77 S. Ct. 490, 1 L. Ed. 2d 465.

Substantially similar, if not identical, "Dairy Queen" franchise contracts have been construed as to aspects of these same issues in Ar-Tik Systems, Inc. v. McCullough, 133 F. Supp. 807; Medd v. Boyd Wagner, Inc., 132 F. Supp. 399; Temperato v. LaBrot (Mo. App.), 358 S. W. 2d 106; Capital Dairy Queen v. McCullough Dairy Queen, 125 U. S. P. Q. 540, and the federal district court decision in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra.*

All of the "Dairy Queen" cases cited above have found it necessary, as we do, to review the history of the development of the "Dairy Queen" trademark and the tie-in with the use of the soft ice cream machine. A case very aptly reviewing this development and history, and meeting the same issues we have before us here, is Medd v. Boyd Wagner, Inc., *supra.* There, the McCulloughs

had granted franchise rights to the plaintiffs, the same as they had to the plaintiffs here who, in turn, under contracts similar to the ones here, had subcontracted to parties in the same status as the defendants, Crawfords, here who were in turn granted the right to subcontract.

The defense was the same as here, based on the expiration date of Patent No. 2080971 on May 18, 1954. The court stated the issues as follows: "From all of the foregoing, we take it, therefore, that defendants, first, deny ownership of the trade name in plaintiffs and, second, contend that, with the *expiration of the patent*, plaintiffs lost all right to the exclusive use of the trade name 'Dairy Queen'. * * * The foregoing contentions designated A, B, C, D and E, which are set forth in defendants' brief, when grouped together, seem to contest the right of plaintiffs in the name and *conclude that somehow*, after the expiration of the patent, property in the name became lodged in the defendants." (Emphasis supplied.)

The court reviewed the history of the same trademark "Dairy Queen" that we are dealing with here as follows: "McCullough opened the first 'Dairy Queen' store in the year 1939 and thereafter, until the close of the year 1946, he opened and operated some twenty-one stores dispensing ice milk and operating under the trade name 'Dairy Queen'. These stores were located in the States of Iowa and Illinois. Therefore, at the time that he acquired the patent license from Ar-Tik in 1946, *he had already established a trade name at least in the States of Iowa and Illinois.* He had a right, by license, to introduce his trade name and create a demand for his variety of goods in a new territory by licenses. E. F. Prichard Co. v. Consumers Brewing Co., supra. The fact that he licensed the use of the name in connection with a license of the patent right renders his position much stronger. He was not entering into a mere naked license agreement. See E. I. DuPont De Nemours & Co. v. Celanese Corporation of America, 167 F. 2d 484, 35

C.C.P.A., Patents, 1061, 3 A. L. R. 2d 1213. * * * When McCullough licensed plaintiffs to the use of the patent and the trade name in the State of Ohio in December of 1946, he had established the trade name 'Dairy Queen' as being distinctive of a style and mode of operation in the sale of an ice milk product. *Plaintiffs, by virtue of their license agreement, set out immediately to extend their business, to exploit the patent and the trade name in the State of Ohio by way of sub-licenses to district operators.* Some twenty-two such sub-licenses were issued to district operators in the State of Ohio before the district operator's license was extended to Boyd Wagner, Incorporated, and during this time plaintiffs themselves operated some four or five stores in the State of Iowa. In less than eight years, from January of 1947 to May 18, 1954, plaintiffs and their licensors, McCulloughs, extended the business, *not only throughout the States of Ohio, Illinois and Iowa, but into most of the States of the Union, until the 'Dairy Queen' enterprise numbered last year some 2,600 retail stores scattered throughout the country, 200 of which were in the State of Ohio."* (Emphasis supplied.)

Then, going to the stated issue in the case, the court said: "We believe from all of this, that plaintiffs were offering more than a naked license to these store operators. Through their district operator, they were offering an established name that had property value of great worth from which they should not be divested without their consent. * * * We are here confronted with a situation where the defendants knowingly entered into a license agreement to use the trade name and the trade phrase and paid compensation therefor over a period of years. *We believe that they are precluded from taking possession of the trade name and the trade phrase without compensation therefor and without the consent of the rightful owners."* (Emphasis supplied.)

This case also meets head-on the basic contention of patent monopoly, misuse, and illegality strenuously as-

serted by the defendants here. The court said: "We turn now to the second named defense, to wit, that, with the expiration of the patent on the freezer machine, plaintiffs' rights to the exclusive use of the trade name 'Dairy Queen' and the trade phrase 'The Cone with the Curl on Top' ceased to exist. * * * Defendants, in advancing the second defense, place reliance chiefly on Singer Manufacturing Co. v. June Manufacturing Co., 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118; Kellogg Co. v. National Biscuit Co., 305 U. S. 111, 59 S. Ct. 109, 83 L. Ed. 73; Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U. S. 249, 66 S. Ct. 101, 90 L. Ed. 47; and Checker Cab Mfg. Corporation v. Green Cab Co., 6 Cir., 35 F. 2d 631. * * * The above cases are not convincing and are not determinative of the issue raised here by the defendants. We are convinced, from the evidence, that the trade name 'Dairy Queen' and the trade phrase 'The Cone with the Curl on Top' are not associated in the public mind with the patented freezer machine, and that no attempt was made to so associate them; and there is not here an attempt to extend the life of the patent by use of the trade name and the trade phrase. * * * *the right to the exclusive use of the trade name continues in the patentee despite expiration of the patent.* Telechron, Inc. v. Telicon Corp., 3 Cir., 198 F. 2d 903; Ironite Co. v. Cement Waterproofing & Ironite Co., D. C., 20 F. Supp. 603; Prest-O-Lite v. Davis, 6 Cir., 215 F. 349. * * * If an accounting of all gains and profits made by defendants by reason of the acts complained of and damages that may have been suffered by plaintiffs are claimed, then that matter may be pursued in due time." (Emphasis supplied.)

But, we need not look solely to the construction placed on this trademark and the contract as construed by the Medd case, *supra.* We are aided by the conduct of the defendants and the interpretation they *placed on these* contracts themselves.

It is to be assumed that parties to a contract *know best what was meant* by its terms, and that whatever

is done by the parties *during the period of performance is done as they intended it should be.* The interpretation given a contract, by the parties themselves while engaged in their performance of it, is one of the best indications of *their true intent,* should be given great, if not controlling influence, and the courts ordinarily should enforce such construction. Dunn v. Mutual Ben. Health & Acc. Assn., 135 Neb. 506, 282 N. W. 487; 12 Am. Jur., Contracts, § 249, p. 787; C. W. Hull Co. v. Westerfield, 107 Neb. 705, 186 N. W. 992, 29 A. L. R. 105; 4 Neb. Law Bulletin 149; Ord Hardware Co. v. J. I. Case Threshing Machine Co., 83 Neb. 353, 119 N. W. 682. Correlated to and following this basic principle is the rule that the assertion of the invalidity of a contract is nullified by the subsequent *acceptance of benefits growing out of the contract* claimed to have been breached. Wegner v. West, 169 Neb. 546, 100 N. W. 2d 542; Einot, Inc. v. Einot Sales Co., Inc., 154 Neb. 760, 49 N. W. 2d 625; Dakota County v. Central Bridge & Constr. Co., 136 Neb. 118, 285 N. W. 309.

The defendants, Crawfords, were already operating ice cream and frozen food stores, and desired to acquire and operate "Dairy Queen" stores. They wanted the trade name and the use of the machine that was tied in with it. The McLeods could not grant this, nor could the defendants secure what they wanted unless they got the right to use the machine, McCulloughs controlling both the trademark and the use of the machine down through the line of contractees. McCulloughs, *not the patent owner,* required the use of the machine. The contracts entered into were the only way the parties could put their scheme of operation into effect *at the time of the original contracts.* If we assume, as defendants argue, that both parties were free to use the machine on May 18, 1954, the defendants could have abandoned the machines and the trade name and ceased operating "Dairy Queen" stores. Or, they could have attempted to purchase the machine independently for

some other type of operation. This latter they did not and could not do because the trademark owner required that "Dairy Queen" trademark and the machine go together. This, both the McCulloughs and the McLeods, the trademark owners, had a right to do whether the machine or product was patented or not. So, being free to choose their own course of action at all times, what did the defendants actually do? They fixed their own obligation under the contracts by their own voluntary performance. They operated the stores, used the required machine in connection therewith, and performed and received the benefits of the contract through the year 1961, over 7 years after the patent expiration. The defendant, H. R. Crawford, testified that the first time he became concerned about the patent was approximately January 10, 1958. There is no evidence in this case that the expiration of the patent affected the defendants' business in any way. The increase in the amount of mix sold would indicate the opposite. The plaintiffs did not agree to guarantee or to bear the risks of the competitive use of the machine by others. And, there is no evidence that when the patent expired that the machines were used at all in defendants' territories, much less any evidence as to damage from competitive use. The defendants own continued performance demonstrates that they realized that the required tie-in of the trademark with the machine actually protected them from the imaginary competitive assault that they now, on hindsight, complain could have existed. It not only protected them, but the defendants' voluntary performance prevented the plaintiffs from contracting the use of the trademark to other parties. It is clear, therefore, that the defendants voluntarily took advantage of a trademark business scheme with the incidental right and duty to use a particular type of machine. The plaintiffs performed everything necessary for the defendants' actual use and enjoyment of the benefits growing out of the contracts.

This retroactive attack on the expiration date of the patent amounts to no more than a claim that someone other than the defendants could have used the machine after May 18, 1954. There is no evidence that anyone did. To sum it up, the conduct of the defendants, their acceptance of benefits, and their continued use demonstrate conclusively that they themselves interpreted the contracts squarely consistent with the interpretation and the reasons therefor set out in Medd v. Boyd Wagner, Inc., *supra;* Ar-Tik Systems, Inc. v. McCullough, *supra;* Capital Dairy Queen, Inc. v. McCullough Dairy Queen, *supra;* Estate of Gowdey v. Commissioner of Internal Revenue, 307 F. 2d 816.

Defendants, nevertheless, strenuously urge Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra,* asserting it is the latest (March 1962, 3rd Circuit) and highest federal decision. We note that it was a three-judge decision with one judge dissenting, who agreed with the lower court decision and the holding in Medd v. Boyd Wagner, Inc., *supra.*

In Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra,* relied upon by the defendants, the patent owner, *not the franchise grantor,* sued a subcontractee of McCulloughs, the same as the McLeods here, for the 4¢ per gallon mix fee or "royalty" due it on mix used after the expiration date of the patent, May 18, 1954. This follows the contract provision requiring, as the McLeods were here, that each franchise grantor pay that amount direct to the patent owner for the use of the machine. The suit was brought as a third party beneficiary and against a franchise grantor, the same as the McLeods were here. In none of these franchise contracts are the "Dairy Queen" store operators required to pay this; it is a liability imposed on the franchise grantor. The court held that the 4¢ payment to Ar-Tik Systems was a severable consideration in the contract, and as such condemned as illegal relying on Scott Paper Co. v. Marcalus Mfg. Co., Inc., *supra.* Said the court, one judge

dissenting: "As stated heretofore *a separate considera-tion is set forth in paragraph 4 of the agreement of October 18, 1949, supra, for this right. The obligation to pay the four cent royalty is found in paragraph 3 of the said agreement and is solely for the use of the pat-ented machines.* * * * After the expiration of Patent No. 2080971 on May 18, 1954, the grant of patent monopoly was spent. An attempt to extend that monopoly by the exaction of royalties thereafter was unenforceable. Such action clearly appears to be interdicted by Scott Paper Co. v. Marcalus Co., supra, and American Securit Co. v. Shatterproof Glass Corp., supra." (Emphasis sup-plied.)

The majority opinion in the above case marked the clear difference between that case, the Medd case, *supra,* and the present case before us. It said: "The marked distinction between that case (Medd v. Boyd Wagner, Inc., *supra)* and this is that it revolved com-pletely around the ownership of the trade name and trade phrase. Ar-Tik did not appear in the suit and the issue of the payment to it of royalties on the freezer was not raised."

In further distinguishing the two cases, the majority opinion said: "There is no evidence in this case to sup-port any claim that Ar-Tik was vested with any owner-ship or interest in the trade name Dairy Queen, in Pennsylvania. The name was created by McCullough and has been exploited in Pennsylvania by the defend-ant, Dairy Queen, Inc., under the title it acquired stem-ming originally from McCullough. Ar-Tik's royalty as contracted for by the McCulloughs and their assigns down to the defendant was solely for the use of its patent. * * * The continued payments by defendant (here the defendants, Crawfords) to its assignors and the McCulloughs (here the plaintiffs, McLeods) under its obligations to them *only indicates the recognition of its duty to pay for the right to develop the described terri-*

*tory for its operation of Dairy Queen stores."* (Emphasis supplied.)

It seems to us that this case is authority for the holding that the patent holder may not collect royalties beyond the expiration date, but that a licensee may couple a valid trademark with the required use of a specific machine, patented or not, and enforce such an agreement. No case has been cited holding the "Dairy Queen" trademark franchise contracts invalid. The validity of the "Dairy Queen" agreements has been upheld in Medd v. Boyd Wagner, Inc., *supra;* Ar-Tik Systems v. McCullough, *supra;* Temperato v. LaBrot, *supra;* Capital Dairy Queen v. McCullough Dairy Queen, *supra;* and the quoted portions of Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra.*

Beyond this, the restricted holding in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra,* of illegality as to collection by the patent owner beyond patent term, seems to be contrary to authority and the best reasoning, and has already been refused acceptance by the courts. In that case, the court noted that the general rule seemed to be to the contrary and cited to this effect: Walker, Patents, p. 456 (1961 Supp. to Vol. II Deller's ed.); Ellis Patent Licenses, § 109, p. 128 (3rd ed. Deller, 1958) and 69 C. J. S., Patents, § 262, p. 802. The court then proceeded to analyze the cases supporting the rule and, resting its decision on Scott Paper Co. v. Marcalus Mfg. Co., *supra,* and American Securit Co. v. Shatterproof Glass Corp., *supra,* reached an opposite conclusion and, therefore, held Ar-Tik's severable 4¢ royalty illegal.

This issue, including the validity of the holding in Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra,* has been met in a very recent (June 1963, Washington) case, Thys Company v. Brulotte, 382 P. 2d 271. In that case, the contract was direct with the patent holder, no tieing-in with a trademark franchise was involved, and it was for a fixed term extending beyond the expiration date of the patent. The court held: "The next contention is

that the contracts were unenforcible because they licensed the use of patents beyond the 17-year period of monopoly granted by the sovereign. * * * The great weight of authority, as well as the stronger reasoning, is that parties to a licensing agreement may contract for the payment of royalties beyond the expiration of the patent, although, in the absence of such an agreement, a license contract expires when the licensed patent expires. Among the authorities so holding are E. R. Squibb & Sons v. Chemical Foundation, Inc., 2 Cir., 93 F. 2d 475; Starke v. Manufacturing Nat. Bank of Detroit, D. C., 174 F. Supp. 882; Tate v. Lewis, D. C., 127 F. Supp. 105; H-P-M Development Corp. v. Watson-Stillman Co., D. C., 71 F. Supp. 906; and Six Star Lubricants Co. v. Morehouse, 101 Colo. 491, 74 P. 2d 1239. * * * *We are aware of a recent contrary decision in Ar-Tik Systems, Inc. v. Dairy Queen, Inc.,* 302 F. 2d 496 (C. A. 3d 1962). In that case the payment of royalties was required throughout the life of the machines sold. This was held to be a misuse of patents. We may assume that the agreement was enough like those involved in this case to make the rule applicable. We find the reasoning of the earlier cases more appealing, however, and we are not obliged to follow decisions of lower federal courts." (Emphasis supplied.)

At the risk of belaboring the point, the Thys case, *supra,* and Medd v. Boyd Wagner, Inc., *supra,* analyze the *supporting cases* of Scott Paper Co. v. Marcalus Mfg. Co., Inc., *supra,* and American Securit Co. v. Shatterproof Glass Corp., *supra,* which are the basis of the Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra,* holding. We shall not extend this opinion by an analysis of these holdings. They all involve the attempt to recreate a patent monopoly on completely expired patents, cr an attempt to tie in a group of patents in violation cf the principle of combinations in restraint of trade. The distinction between legitimate "tie-ins," such as a trademark with products or machines, and a device to evade

the rules against combinations in restraint of trade or monopoly, is pointed out in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U. S. 827, 70 S. Ct. 894, 94 L. Ed. 1312; Susser v. Carvel Corp., 206 F. Supp. 636; Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F. Supp. 655; Morse-Starrett Products Co. v. Steccone, 86 F. Supp. 796; Brosious v. Pepsi-Cola Co., 155 F. 2d 99.

We point out in this case that there was a valid trademark and live patent when the parties entered into the contracts; that the exact patent by number was disclosed to defendants and recited in the contracts; and that there was no obligation for the defendants to use the condemned "tie in" agreement for any period of time and certainly not beyond May 18, 1954. *We point out that defendants' obligation to pay the mix fee was co-extensive* with their voluntary decision to enjoy the benefits of the contracts. It terminated when the defendants decided not to enjoy the benefits accruing thereunder. The defendants either had actual or constructive notice of the expiration date of May 18, 1954, it was disclosed, published of record, and ascertainable by them at any time. No cases are cited requiring contract disclosure of a patent expiration date which is of public record and required to be so. See, 40 Am. Jur., Patents, § 9, p. 537; Sontag Chain Stores Co. v. National Nut Co., 310 U. S. 281, 60 S. Ct. 961, 84 L. Ed. 1204. The defendants received the benefits for over 7 years after the patent expiration date. Moreover, they were given the right to subcontract, which they did, and there is no evidence of any nature whatsoever that they were injured by any competitive use of the machines or the trademark. *Plaintiffs were thus, in effect, effectively prevented from contracting the trademark franchise to others because of the conduct of the defendants in continuing the performance of the contracts and the use of the trademark.* Under these circumstances, defendants are estopped to set up the invalidity of these contracts.

Medd v. Boyd Wagner, Inc., *supra;* E. F. Prichard Co. v. Consumers Brewing Co., 136 F. 2d 512; Smith v. Dental Products Co., Inc., 140 F. 2d 140.

We point out further that plaintiffs' claim is not the product of a veiled technique to create a patent monopoly case in the form of a "tie-in" agreement to extend its date. Plaintiffs forced defendants to do nothing in relation to the patent. After May 18, 1954, they were free to use the machine alone, and freed of the patent restriction. What they were forbidden to do was to use the machine in a "Dairy Queen" store, unless they paid a mix fee on whatever amount they voluntarily used. That the plaintiffs had the right to require certain products or machines, patented or unpatented, as a condition of the use of the trademark, cannot be questioned. It may be that the fact the patent didn't expire until May 18, 1954, was an inducing incentive for them to enter into the contracts. But, it becomes no more than just that. The defendants could be relieved at any time by voluntary nonuse. The undisputed testimony as to the large amount of mix sold, the continued operation of the stores, and the use of the name "Dairy Queen" for many years after May 18, 1954, refute completely any claim of damage. Turning the situation around, the defendants would have us believe that they had a right to buy and use the machines, use the trademark name, operate the stores, and be completely free of their voluntary assumed obligation under the contracts. All this because the patent on the machine required to be used with the trademark expired as a matter of public record on May 18, 1954. Such a position is untenable.

As an addendum to their basic argument as to patent misuse and illegality, defendants argue that the contracts were void and illegal because of the restrictions placed in the contracts on the use of the machines. The patent license cases cited are not in point. A trademark licensor has not only the right, but the duty, to control the circumstances under which the name is used. Capital

Dairy Queen v. McCullough Dairy Queen, *supra;* Brosious v. Pepsi-Cola Co., *supra.* As we have pointed out, the plaintiffs, in addition to controls over the quality of the mix and uniforms of operators, could control the type of freezers to be used in the stores in connection with the trademark, even if there had been no patent on the freezers at any time. The fact that they had the exclusive rights to the patent at the time they made the agreements is entirely incidental. The "Dairy Queen" restrictive agreements on the defendants' use of the machines have been attacked in several cases, and have been held valid, substantially on the same grounds as given herein. See, Engbrecht v. Dairy Queen Co. of Mexico, Missouri, 203 F. Supp. 714, Moberg v. Baker, 217 Or. 551, 342 P. 2d 828; Medd v. Boyd Wagner, Inc., *supra;* Susser v. Carvel Corp., *supra.* Preservation of the unique value of the trademark and the retention of the enjoyments of it require a trademark owner to include controls over the nature, quality, and the method of production of the finished product associated with the trade name. Morse-Starrett Products Co. v. Steccone, *supra;* Brosious v. Pepsi-Cola Co., *supra.*

Defendants further plead fraud and yet in their brief abandon this defense. They further argue that illegality taints the whole contracts and yet they are severable as far as defendants are concerned, giving them as innocent parties a right to recover back payments made. This, in effect, would amount to a right to collect a forfeiture, based on the contention of illegality. What we have said on the basic issues in the case eliminates these assertions from further consideration.

Defendants, in a many sided and shifting defense, further argue that when the defendants ceased payments after 1957, they therefore terminated the contracts and are not liable for mix used in the operation of the stores after that date. This, they argue, is true because of paragraph 11 of the contracts which provides that if they cease to make payments, the plaintiffs may notify the

defendants in writing and, if payments are made in 30 days, no further action may be taken. It then provides, *"but if payments are not made then the First Party (plaintiffs) shall have the right to terminate this agreement."* (Emphasis supplied.) The answer to this argument is almost apparent from the emphasized language quoted. Provisions of this nature do not furnish an exclusive measure of the remedy. 18 Am. Jur., Election of Remedies, § 36, p. 155.

Substantially the same provision in a "Dairy Queen" contract was construed in Moberg v. Baker, *supra,* exactly contrary to defendants' contention. Further, such a construction would give defendants a right, despite operation of the stores and use of the "Dairy Queen" trade name, to terminate liability by their own breach. There is no merit to this contention.

Defendants argue the failure of the McLeods, at least at this time, to have paid all of the 4¢ mix royalty they (the McLeods) are obligated to pay Ar-Tik. As pointed out, this is no obligation of the defendants. It flows to Ar-Tik as third party beneficiary under the contracts and is not an issue in this case. It is a severable and distinct separate obligation of the plaintiffs and not the defendants. Ar-Tik Systems, Inc. v. Dairy Queen, Inc., *supra.* But, it is further apparent that the contracts only call for this payment in event defendants pay, which they have not done. In any event, there is a complete absence of showing of any damage to defendants.

From what has been said, these contracts are valid, enforceable agreements. They are not tainted with illegality. The defendants voluntarily measured their obligation by the extent they used the trademark and the machine in operating "Dairy Queen" stores. No reason exists why they should not pay for the benefits they received and the obligations they caused themselves under the contracts. The trial judge in this case came to the correct conclusion. The judgment is affirmed.

AFFIRMED.